**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
              :
OTTO VERNON,          :
       Plaintiff,    :
              :   19-CV-10520 (OTW)
              :
              :   **OPINION & ORDER**
     -against-      :
              :
ANDREW SAUL, Commissioner   :
of Social Security       :
        Defendant.  :
------------------------------------------------------------x

    **ONA T. WANG, United States Magistrate Judge:**

**I.  Introduction**

    Plaintiff Otto Vernon commenced this action pursuant to Titles II and XVI of the Social

Security Act, 42 U.S.C. § 405(g), challenging the decision by the Commissioner of Social Security

(the "Commissioner") to deny Plaintiff's application for supplemental security income ("SSI").

The Commissioner has moved for judgment on the pleadings. (ECF 14). Plaintiff has not

submitted an opposition. I have considered the merits of Commissioner's arguments.

    For the reasons set forth below, the Commissioner's Cross-Motion for Judgment on the

Pleadings is DENIED, and the case is remanded for further proceedings pursuant to 42 U.S.C.

§ 405(g).

**II.  Facts**

    **A. Procedural Background**

    Plaintiff filed an application for Supplemental Security Income ("SSI") benefits on

January 11, 2016. (Tr. 309). Plaintiff alleged that he became disabled on June 1, 2014 because

of diverticulitis, allergies, back pain, anxiety, and depression. (Tr. 43; Tr. 180). The Social

Security Administration ("SSA") denied Plaintiff's claim after determining that Plaintiff's limitations did not preclude him from all work activity. (Tr. 43-44).

Plaintiff then requested a hearing, and at the first hearing on January 5, 2018, he requested time to obtain an attorney. (Tr. 44). At the next hearing, on May 10, 2018, before Administrative Law Judge ("ALJ") Lori Romeo, Plaintiff, represented by counsel, testified as did Carlos Jucino-Berrios, M.D.[1], a psychiatric consultative expert. At the final August 22, 2018 hearing, again before ALJ Romeo, James M. McKenna, M.D., a medical expert, and Pat Green, Ph.D, a vocational expert ("VE") testified. (Tr. 40-79). On September 21, 2018, ALJ Romeo issued a decision finding that Plaintiff was not disabled. (Tr. 5-18). On September 5, 2019, the Appeals Council denied review. (Tr. 1).

### B. Plaintiff's Social History and Testimony

Plaintiff was born September 22, 1964 in Guatemala. (Tr. 326). Plaintiff has the equivalent of a high school education, and can read and write in English. (Tr. 73, 89). Plaintiff has a GED. (Tr. 460). Plaintiff lost his mother at a young age, and Plaintiff's father is also deceased. (Tr. 432). Their deaths, as well as the deaths of many of his siblings, have greatly affected Plaintiff. (Tr. 432). At a boarding school in Guatemala, Plaintiff was the victim of sexual violence, which continues to affect Plaintiff's mental state. (Tr. 432). Plaintiff lives alone in a ground floor apartment. (Tr. 84, 93-94). Plaintiff last worked as a freelance makeup artist, and before that as a consignment store salesclerk. (Tr. 90-91). Plaintiff has not worked since the disability onset date, June 1, 2014. (Tr. 89-90).

---

[1] Dr. Jucino-Berrio's name is spelled as "Jusino-Berrio" in ALJ Romeo's decision, but Dr. Jucino-Berrios spelled his name to the court reporter with a "c" when he testified. (Tr. 112).

Plaintiff testified at the May 2018 hearing that he can only walk two or three blocks before he begins to feel pain in his feet, and he was prescribed a cane in 2017 because he often fell while walking. (Tr. 97-98). He has attended physical therapy in order to treat his rheumatoid arthritis. (Tr. 97-98). He has also been recommended for physical therapy for his plantar fasciitis, and at the time of the hearing was waiting for insurance approval. (Tr. 98). If not seated on a comfortable couch, Plaintiff can only sit for half an hour with constant adjustment. (Tr. 99).

Plaintiff also reports being unable to carry a gallon of milk. (Tr. 99). He also experiences at times debilitating headaches, which occur daily. (Tr. 100). Plaintiff must "be careful" throughout the day, as these headaches can "knock [him] out" at times. (Tr. 100). At the time of the May 2018 hearing, a neurologist was working on identifying the cause of the headaches. (Tr. 100). Plaintiff additionally struggles to use his hands, and gave up a favorite hobby, knitting, as a result of tremors. (Tr. 100). Plaintiff also leaves post-it notes all over his house because of his memory issues. (Tr. 101).

### C. Medical Background[2]

#### i. Internal Medicine

##### 1. Dr. Daniel J. Baxter, Internal Medicine Specialist (2012-2018)

Plaintiff began receiving care from Dr. Baxter at the William E. Ryan Community Health Center Network ("Ryan Center) in January 3, 2012. (Tr. 968). Dr. Baxter co-signed medical notes

---

[2] The record contains extensive medical records from Plaintiff, including podiatry, vision, and rheumatology records not recapped here.

from other providers at the Ryan Center, and the records contains Dr. Baxter's own notes starting in 2016. *See, e.g.*, Tr. 799.

On September 27, 2016, Plaintiff complained of joint pain and lower back pain. (Tr. 657). Dr. Baxter noted that Plaintiff appeared to be a "[v]ery diffuse and rambling historian." (Tr. 657). Dr. Baxter noted that Plaintiff's peripheral joints exhibited no swelling or limitation of his range of motion, and that Plaintiff exhibited no spinal or paraspinal tenderness. (Tr. 660). Despite Dr. Baxter's doubts about a rheumatoid arthritis diagnosis, Dr. Baxter referred Plaintiff to rheumatology. (Tr. 660). Dr. Baxter also referred Plaintiff to neurology, as Plaintiff complained of persistent and severe headaches. (Tr. 660).

On June 12, 2017, Plaintiff complained of left knee pain/weakness, bilateral hip pains, and left elbow pains. (Tr. 885). Dr. Baxter noted that Plaintiff was an "[e]xtremely vague and rambling historian," and that Plaintiff "missed rheumatology appointment and never kept [the] neuro appointment." (Tr. 885). Plaintiff complained of "very vague recent sensation of forehead spasms . . . [and] diffuse joint pains" that had not changed from the past. (Tr. 885). Plaintiff reported that his pain was a "7" and was in his left elbow and "multifocal." (Tr. 887). Dr. Baxter noted that it was "extremely difficult to determine what is going on with [plaintiff], but there's little question that he is depressed." (Tr. 887). Dr. Baxter referred Plaintiff to a physical therapist and also a rheumatologist at Plaintiff's request despite "doubt[ing] significance of his joint pains." (Tr. 887). Dr. Baxter also recommended increased physical activity and gave nutritional counseling. (Tr. 888).

On July 12, 2017, Dr. Baxter noted that Plaintiff was pleasant and "slowly ambulatory with cane, slightly antalgic gait, comfortable, well groomed, well-appearing, appears stated

age, average weight." (Tr. 1088). Plaintiff reported pain in the lower extremities when his vital signs were taken, and rated his pain as a "7." (Tr. 1089). Dr. Baxter also stated that Plaintiff exhibited "no ataxia but slow gait; no focal deficit." (Tr. 876). Dr. Baxter stated that Plaintiff exhibited "vague symptoms" and that "there may be a significant component of depression contributing to his joint pain." Dr. Baxter referred Plaintiff to be x-rayed.[3] (Tr. 876).

On September 11, 2017, Plaintiff complained of constant, chronic headaches, vague joint pains in hips and knees, memory lapses, fatigue, vague dizziness, and anxiety attacks. (Tr. 1077). Dr. Baxter noted that Plaintiff was a "very vague historian." (Tr. 1077). Plaintiff described his pain as a "9" and as generalized aches. (Tr. 1078). Dr. Baxter noted that Plaintiff appeared "alert and oriented, depressed and anxious affect as he lists his various symptoms and complaints, well groomed, appears stated age, average weight, slowly ambulatory with cane, NAD." (Tr. 1080). Dr. Baxter also noted that Plaintiff had a "slightly antalgic gait" with his cane. (Tr. 1080). Dr. Baxter also refilled Plaintiff's psychiatric prescriptions. (Tr. 1080).

On October 30, 2017, Dr. Baxter saw Plaintiff for a follow up after Plaintiff went to the emergency room on October 6, 2017 for diverticulitis. (Tr. 1057). Plaintiff also complained of chronic lower back pain. (Tr. 1057). Plaintiff told Dr. Baxter that he was waiting for the psychiatric clinic at St. Luke's to schedule a psychiatric appointment for him, and reported that his depression was the same. (Tr. 1057). Plaintiff also reported that he had a physical therapy

---

[3] On July 13, 2017, Kenneth S. Cooke, M.D. of New York Radiology Partners (West Side Radiology Associates, P.C.) reported the results of Plaintiff's lumbar spine x-ray to Dr. Baxter. (Tr. 974). Dr. Cooke compared these x-rays to the ones taken on September 8, 2014. (Tr. 974). Dr. Cooke noted that these x-rays show "mild facet joint degenerative changes at L5/S1 level," but that otherwise, Plaintiff's x-rays showed an "unremarkable lumbar spine." (Tr. 974). Dr. Cooke also stated that there was "no significant change" from the 2014 x-rays, but did not state to what extent changes were evident. (Tr. 974).

appointment for back pain, and that the lower back pain had been present for many years but that he had not seen an orthopedic specialist. (Tr. 1057). Plaintiff also complained of knee pain and very vague intermittent leg weakness, and informed Dr. Baxter that he had an appointment with a rheumatologist and was waiting on an appointment for "ID clinic." (Tr. 1057). Plaintiff rated his pain as a "6." (Tr. 1058). Dr. Baxter noted that Plaintiff was "pleasant, overweight, slowly ambulatory with cane and with slightly antalgic gait, comfortable, well groomed." (Tr. 1060). Dr. Baxter also noted that Plaintiff was "probably stable" and that "as before, underlying depression complicates evaluation of his various symptoms." (Tr. 1060). Dr. Baxter referred Plaintiff to orthopedics regarding his lower back pain. (Tr. 1060).

On November 29, 2017, Plaintiff complained of unrelieved constipation, chronic leg pain, and dry eyes and mouth. (Tr. 1037). Plaintiff complained that his pain was a "7." (Tr. 1038). Dr. Baxter noted that the patient was "pleasant, alert, happy, appears stated age, comfortable, well groomed, [had a] slightly depressed affect . . . average weight, slowly ambulatory with cane." (Tr. 1042). Dr. Baxter noted that Plaintiff's knees had a full range of motion. (Tr. 1042). Dr. Baxter stated that Plaintiff continued to have vague symptoms despite negative laboratory test results, and that he urged Plaintiff to keep his pending rheumatology appointment. (Tr. 1043). Dr. Baxter noted that Plaintiff's underlying depressive disorder complicated the evaluation. (Tr. 1043).

On December 6, 2017, Dr. Baxter completed a Report of Physical Impairment for the Social Security Administration. (Tr. 960-64). Dr. Baxter noted that Plaintiff must lie down for 2-3 hours a day due to pain and that Plaintiff's psychiatric medications decreased Plaintiff's alertness. (Tr. 961). Dr. Baxter also stated that Plaintiff had generalized arthropathy and Lyme

6

disease, which produce pain or serious discomfort. (Tr. 961). Dr. Baxter stated that Plaintiff could occasionally lift 0-5 pounds, but should never lift more than that. (Tr. 961). Dr. Baxter also stated that during a typical 8-hour workday, Plaintiff could occasionally carry 0-5 pounds, but never more than that. (Tr. 962). Dr. Baxter noted that Plaintiff was unable to stand or walk for more than 2 hours without stopping to rest, and could only walk or stand for less than two hours per day. (Tr. 962). Dr. Baxter stated that Plaintiff could never bend, squat, climb, or reach. (Tr. 962). Dr. Baxter stated that Plaintiff would be unable to use either hand for simple grasping, pushing or pulling of arm controls, or fine manipulation. (Tr. 963). Similarly, Dr. Baxter stated that Plaintiff was unable to use his feet for repetitive movements such as pushing and pulling of leg controls. (Tr. 963). Dr. Baxter noted that Plaintiff's restriction – in being around moving machinery, exposure to marked changes in temperature and humidity, driving a motor vehicle, exposure to dust, fumes, and gas, and unprotected heights – were not caused by Plaintiff's medical condition, but that working on a regular and continuous basis would cause Plaintiff's condition to deteriorate. (Tr. 963). Dr. Baxter also noted that Plaintiff's condition and/or symptoms would interfere with the ability to attend work on a regular basis because of his pain from his arthropathy. (Tr. 964).

On February 1, 2018, Plaintiff complained of pain in his back and knees, as well as a diverticulitis flare up. (Tr. 1015). Plaintiff reported continued "very very vague" lower abdominal pain with constipation and told Dr. Baxter that the rheumatologist had prescribed him braces for the knees and back. (Tr. 1015). Dr. Baxter noted that Plaintiff was vague in describing the rheumatologist's diagnosis. (Tr. 1015). Plaintiff also reported to have returned to physical therapy. (Tr. 1015). Plaintiff also reported seeing a psychiatrist and a psychotherapist

at Bailey House. (Tr. 1015). Dr. Baxter noted Plaintiff was "[a]s before, very vague and diffuse

historian." (Tr. 1015). Plaintiff reported his pain as a "10" and located in the back/abdomen.

(Tr. 1016). Dr. Baxter noted in the general examination that Plaintiff was "pleasant, alert and

oriented, overweight, appears stated age, well groomed, slowly ambulatory with cane, slightly

antalgic gait and discomfort with movement but in [no apparent distress]" and that Plaintiff

was "slightly anxious but without overt depressive features." (Tr. 1016). Dr. Baxter also noted

that this was a "difficult case" because Plaintiff was seeing multiple specialists: "ID, ortho, PT,

. . . GI, and rheumatology specialists." (Tr. 1017). Dr. Baxter stated that Plaintiff's "prognosis is

guarded re his multiple symptoms and comorbidities." (Tr. 1017).

On April 23, 2018, Plaintiff complained of "daily palpitations" for the past two months,

which Plaintiff complained were worsening. (Tr. 990). Plaintiff described the chest pain as "very

vague palpitations with stabbing chest pain" that were unrelated to exertion and only lasted a

few seconds. (Tr. 990). Plaintiff also complained of intermittent chest pain, right leg numbness,

and forehead and hand trembling when emotionally upset. (Tr. 990). Dr. Baxter also stated that

Plaintiff reported seeing a neurologist for "vague [headaches] and 'mental fog'" and that "tests

[we]re ongoing." (Tr. 990). Plaintiff also told Dr. Baxter that infectious disease specialist wanted

to give "prolonged IV Rx for Lyme" but that Plaintiff said he did not have the time. (Tr. 990).

Plaintiff also reported seeing a psychiatrist who advised lithium, but that Plaintiff refused to

take it. (Tr. 990). Dr. Baxter also noted that Plaintiff continued to complain of vague lower back

and bilateral knee pain. (Tr. 990). Dr. Baxter stated Plaintiff "requests a referral to ENT which

he says neurologist has advised re vague 'allergic' symptoms as well as another PT referral."

(Tr. 990). Dr. Baxter noted during his general physical examination of Plaintiff that Plaintiff was

"pleasant, alert, chronically ill appearing, appears older than stated age, slowly ambulatory with cane, frail, in NAD, slightly disheveled." (Tr. 992). Dr. Baxter also noted that both of Plaintiff's knees were "bound up in braces" and that while Plaintiff had a very slow gait, he exhibited no focal motor deficit. (Tr. 992). Dr. Baxter also stated that "[a]s before, it is impossible to fully evaluate [Plaintiff] because 1) he is very vague and diffuse historian, 2) it is unclear exactly what meds [Plaintiff] is taking, and 3) it is completely unclear what evaluations and/or [treatments] the [plaintiff] is getting from the many outside specialists he is seeing; compounding all his care is his severe depression." (Tr. 992). Dr. Baxter also noted that although Plaintiff was seeing two psychiatrists, he had been refusing many of their recommendations, especially the need for lithium. (Tr. 992). Dr. Baxter also believed that "altho[ugh] [Plaintiff] probably does have significant med[ical] problems, most likely his major issues are psychosocial, which have contributed to his stress and perceived need for specialty medical care." (Tr. 992).

From April 27-30, 2018, Dr. Baxter completed a report of physical impairment and wrote an accompanying letter. (Tr. 1155-60). Dr. Baxter stated that he had been Plaintiff's physician for "the past three years," and that during that time, he had "observed [Plaintiff]'s health deteriorate both physically and psychiatrically and that [Dr. Baxter] would describe his current condition as dire." (Tr. 1155). Dr. Baxter stated that due to Plaintiff's physical and mental illnesses, Dr. Baxter believed Plaintiff was unable to work. (Tr. 1155). Dr. Baxter noted that Plaintiff tested positive for Lyme disease in July and September 2017, and observed that Plaintiff's Lyme disease "is linked to the deterioration of his musculoskeletal system, cardiovascular symptom, cognitive problems, and inflammatory arthritis." (Tr. 1155). Dr. Baxter

stated that Plaintiff was unable to walk or stand for more than 2 hours total per day, could not

walk "more than 5 city blocks without requiring assistance," could not "sit in one position for

more than 5 minutes," often experienced "shakes and extreme pain," and suffered from

"debilitating headaches." (Tr. 1155). Dr. Baxter concluded that during the workday, Plaintiff

could never bend, squat, climb, or reach. (Tr. 1158). Dr. Baxter also noted that Plaintiff's use of

his hands had gradually deteriorated and that Plaintiff could not do simple grasping, pushing

and pulling of arm controls, and fine manipulation with either hand. (Tr. 1159). Plaintiff's

symptoms required his use of a back and leg brace, a cane, and a walker. (Tr. 1155). Dr. Baxter

stated that he "agree[s] that [Plaintiff]'s conditions meet Listing 14.09 and equal Listing 1.02."

(Tr. 1155). Dr. Baxter further stated that "[t]he damage to [Plaintiff's] lower back is so severe

that it has the same medical effect as Listing 1.02." (Tr. 1155). Dr. Baxter also stated "[i]t is also

my medical opinion that [Plaintiff]'s issues are primarily psychiatric and social. He is often

paranoid that others are 'out to get him' and finds it difficult to get along with others. He

suffers from memory loss and inability to effectively communicate thoughts and ideas. He has

trouble understanding and processing information. It is possible that his psychiatric symptoms

exacerbate his physical ones." (Tr. 1155). Dr. Baxter also referred Plaintiff to a cardiologist for

further treatment after discovering during an echocardiogram that Plaintiff potentially had a

previous heart attack. (Tr. 1155). Dr. Baxter pronounced Plaintiff's prognosis as "guarded to

poor." (Tr. 1157). Dr. Baxter noted that Plaintiff's conditions would "most likely" persist despite

continuous prescribed treatment, and that the physical impact would persist for an

"indeterminant period of time, from many months to many years." (Tr. 1157). Dr. Baxter

concluded that Plaintiff could not work on a regular and continuous basis, because doing so would exacerbate joint pain, which in turn would worsen Plaintiff's depression. (Tr. 1159).

On a June 11, 2018 visit, Dr. Baxter noted that "[a]s before, [Plaintiff was a] very very vague historian," and that Plaintiff complained of having had a "bad cold" for a week, vague bilateral leg and back pain, vague leg pain, and vague depression-related symptoms. (Tr. 1356). Plaintiff described his pain as a "9," and stated that the pain presented as aches in the lower back. (Tr. 1358). Dr. Baxter described Plaintiff as "pleasant, alert and oriented, chronically ill appearing, slowly ambulatory with cane, large bilateral knee braces in place, comfortable, happy, appears stated age, NAD." (Tr. 1358). Dr. Baxter also noted that Plaintiff's psychosocial issues were continuing to impact his chronic symptoms. (Tr. 1359). Dr. Baxter referred Plaintiff to orthopedic surgery for Plaintiff's chronic back and leg pain. (Tr. 1359).

On July 16, 2018, Plaintiff stated that he felt "the same" (in that he still had lower back pain, intermittent pain in his lower left abdomen, and bilateral weakness and pain in his lower extremities). (Tr. 1346). Plaintiff reported his pain as an "8." (Tr. 1349). Dr. Baxter noted that Plaintiff appeared "pleasant, alert, depressed appearing as before, slowly ambulatory with cane, somewhat frail appearing, large Velcro leg and back braces, in NAD, comfortable, well groomed," and that Plaintiff "appear[ed] the same as prior visits." (Tr. 1349). Dr. Baxter also noted that Plaintiff was unable to get onto the examination table. (Tr. 1349).

### 2. Dr. Matthew Pierce, Internal Medicine Specialist (2012)

On January 26, 2012, Plaintiff saw Dr. Pierce at the Ryan Center. (Tr. 847). Dr. Pierce noted that at Plaintiff's visit earlier in the month, Plaintiff complained of low back pain that radiated to his testicles and was worsened by cold weather. The pain had been going on for

approximately a month and a half. (Tr. 847). Plaintiff further complained that he occasionally

loses sensitivity in his fingers and that his fingers swell in the cold. (Tr. 847). Plaintiff reported

that his pain was a "7" on the pain scale and concentrated in the lower back. (Tr. 848).

### 3.   YunYan Zheng, Physician Assistant (2012)

On November 26, 2012, Plaintiff had an appointment with physician assistant YunYan

Zheng, PA-C at the Ryan Center. (Tr. 799). Plaintiff complained of testicular pain radiating to the

lower back, which had persisted for a week, as well as chills, a fever, and body aches, which

had persisted for two weeks. (Tr. 799). Dr. Baxter co-signed the appointment notes. (Tr. 800).

### 4.   Dr. Yoon Yang, Internal Medicine Specialist (2012)

On December 14, 2012, Plaintiff saw Dr. Yang at the Ryan Center complaining of back

pain. (Tr. 788). Plaintiff reported that the pain started in the lower left quadrant and radiating

to the left side of the scrotum and inner thigh. (Tr. 788). Plaintiff described the pain as

"intermittent, cramping, last[ing] minutes and resolv[ing] spontaneously." (Tr. 788). Dr. Yang

referred Plaintiff to physical therapy to treat Plaintiff's chronic back pain. (Tr. 789). Dr. Yang

noted Plaintiff had chronic musculoskeletal back pain but than there was a "new/change in

backpain" of "[p]ain in left flank, radiating to front." (Tr. 789).

### 5.   Dr. Rashanna Lynch, Internal and Family Medicine Specialist (2014)

On September 8, 2014, Dr. Lynch at the Ryan Center saw Plaintiff following his fall from

a dresser the day prior. (Tr. 573). Plaintiff complained of "left upper back pain radiating to his

entire side." (Tr. 573). Dr. Lynch also noted that Plaintiff presented complaints of left rib, left

elbow, and lower back pain after falling from the dresser. (Tr. 573). Dr. Lynch then received the

results of a radiograph of Plaintiff's chest, left elbow, and lumbar spine, which did not show any

abnormalities.[4] (Tr. 565-66). Dr. McLaughlin noted that there was evidence of "minimal degenerative change" in the lumbar spine. (Tr. 566).

### 6. Dr. Seblewongel Wondyrad, Internal Medicine Specialist (2015)

On February 9, 2015, Plaintiff saw Dr. Wondyrad at the Ryan Center. (Tr. 577). Plaintiff complained to Dr. Wondyrad of bilateral ankle pain, left shoulder pain, and back pain that "comes and goes, worse in the morning and during cold season." (Tr. 577). Dr. Wondyrad noted that Plaintiff's gait and range of motion were normal, and that none of the joints appeared swollen. (Tr. 578).

### 7. Dr. Allen Meisel, Internal Medicine Specialist (2016)

On January 25, 2016, Plaintiff saw Dr. Meisel of Industrial Medicine Associates, P.C. for an internal medicine consultation. (Tr. 620). Dr. Meisel noted Plaintiff's main complaints were "[l]umbar back pain, bipolar disorder, low testosterone, gastroesophageal reflux disease, benign prostatic hypertrophy, and seizure disorder." (Tr. 620). Plaintiff reported numbness "in both legs from the knees to the feet" that worsen when he stands for any length of time. (Tr. 620). Dr. Meisel noted that Plaintiff had a normal gait with no acute distress, could walk on heels and toes without difficulty, squatted at 50%, had a normal stance, used no assistive devices, needed no help changing for the examination, nor for getting on and off the exam table, and was able to rise from his chair without difficulty. (Tr. 621-22). Plaintiff reported being able to dress himself and do the "cooking, cleaning, laundry, and shopping." (Tr. 621).

---

[4] Victor McLaughlin, MD of West Side Radiology Associates, P.C. reported that there were no "acute chest findings" and that there was no rib abnormality seen on the radiograph, as well as that the left elbow study was "unremarkable." (Tr. 565-66).

Dr. Meisel found that the sensory exam was inconsistent, but that Plaintiff seemed to have "decreased sensation in all extremities from the shoulders to the fingers and the hips to the feet in all four extremities." (Tr. 622-23). Dr. Meisel also noted that despite Plaintiff's complaints of decreased hand mobility, Plaintiff's hand and finger dexterity was intact, and Plaintiff was dressed appropriately and appeared oriented in all spheres, without any evidence of impaired judgment or memory. (Tr. 623).

Dr. Meisel diagnosed Plaintiff with, *inter alia*, lumbar back pain and bipolar disorder. (Tr. 623). Dr. Meisel ruled out rheumatoid arthritis. (Tr. 623). Dr. Meisel rated Plaintiff's prognosis as "fair," and stated that Plaintiff had "mild limitation standing, walking, climbing stairs, bending, and kneeling." (Tr. 623). Dr. Meisel declined to comment on any limitations caused by Plaintiff's psychiatric symptoms, but noted that Plaintiff should also avoid operating a vehicle or heavy machinery due to his history of seizures. (Tr. 623).

### 8. Dr. Marie Mortel and Dr. Tamara Goldberg, Internal Medicine Specialists (2016)

During Dr. Mortel and Dr. Goldberg's[5] March 3, 2016 examination of Plaintiff at the Ryan Center, Plaintiff reported that he had nightmares and "insomnia," and that he had back pain. (Tr. 701-02). Plaintiff described his back pain as an "8" and chronic in nature. (Tr. 702). During their physical examination of Plaintiff, Dr. Mortel and Dr. Goldberg noted that Plaintiff had no spinal or paraspinal tenderness, and normal neurological motor strength and sensation. (Tr. 702). Plaintiff was referred to physical therapy. (Tr. 702).

---

[5] Dr. Mortel, a medical resident, was the appointment provider, and Dr. Goldberg was the supervising provider.

Dr. Mortel and Dr. Goldberg noted in their assessment that Plaintiff had benign

paroxysmal positional vertigo, fatigue, low back pain, and gastroesophageal reflux disease

("GERD"). (Tr. 702). To treat the low back pain, Plaintiff was given exercise materials indicating

how to stretch his lower back, and referred to the Mt. Sinai/St. Luke's physical therapy. (Tr.

702). Dr. Goldberg noted that Plaintiff gave an "unclear story" of paresthesias and vertigo. (Tr.

703). Dr. Goldberg further stated that "[h]yperinflated description of multiple symptoms [was]

apparent during interview," and that she "suspect[s] somatization." (Tr. 703).

### 9.  Dr. Rashanna Lynch, Internal and Family Medicine Specialist (2018)

On May 18, 2018, Plaintiff saw Dr. Lynch at the Ryan Center complaining of lower back

pain that traveled down the back of his left leg to his toes. (Tr. 1362). Plaintiff described his left

leg pain as a "4." (Tr. 1363). Dr. Lynch ordered an x-ray of Plaintiff's lumbar spine in an effort to

determine the cause of Plaintiff's lumbar back pain. (Tr. 1364). When compared to the x-ray

from July 13, 2017, there were no changes. (Tr. 1378).

### 10. Medical Imaging

On March 1, 2018, Plaintiff underwent MRI of the cervical spine. (Tr. 1314). The MRI

indicated "mild multilevel cervical spondylosis especially at C5-C6 where there is a

mild/moderate right and mild left neuroforaminal stenosis." (Tr. 1314). The reviewing physician

noted that Plaintiff exhibited "[s]traightening of the spine without listhesis," and a "[s]mall

central disc bulge flattens the ventral thecal sac without cord compression." (Tr. 1314-15). The

MRI also showed "[b]road-based central disc bulge flattens ventral thecal sac without cord

compression," and "mild/moderate right and mild left neuroforaminal narrowing." (Tr. 1315).

15

On March 3, 2018, Plaintiff went to NYU Langone Radiology for brain and lumbar spine MRIs. (Tr. 1312). The brain MRI indicated that Plaintiff had "[m]ild inflammatory paranasal sinus disease," but otherwise had a normal brain MRI. (Tr. 1312). The lumbar spine MRI indicated Plaintiff had "[m]ild disc and facet degeneration of the lower lumbar spine without significant foraminal or canal stenosis." (Tr. 1312). The reviewing physician also noted that "[f]or the purpose of this report, the last well developed disc space is considered S1-S2," and that Plaintiff had "[r]educed normal lumbar lordosis." (Tr. 1313). The reviewing physician also stated "[m]ultilevel mild bilateral facet osteoarthritis" was evident in the lower lumbar spine, as well as "multilevel mild desiccation and height loss" in the lower lumbar spine, and "[s]ymmetric small disc bulge at L4-L5." (Tr. 1313).

On April 16, 2018, Plaintiff had an electromyograph (EMG) and nerve conduction velocity (NCV) of the upper extremities, and three days later, on April 19, 2018, Plaintiff had an EMG and NCV of the lower extremities. (Tr. 1316-22). The "[e]valuation of the right peroneal motor nerve showed decreased conduction velocity," but all other nerves were "within normal limits." (Tr. 1316). Both the left and the right tibial H-reflex had prolonged latency. (Tr. 1316). The right peroneus longus, the left peroneus longus, the left vastus lateralis, the right vastus lateralis, and the left and right anterior tibialis showed motor unit amplitude, polyphasic potentials, and diminished recruitment. (Tr. 1316). The doctors indicated that the electrodiagnostic study "reveal[ed] evidence of chronic bilateral L4 and L5 radiculopathy without active denervation." (Tr. 1316). The upper extremity tests revealed a difference between the left and right ulnar motor nerve, indicating "abnormal L-R latency difference." (Tr. 1322).

### ii. Mental Health Treatment

#### 1. Joey Ackerman, LCSW (2012)

On May 3, 2012, Plaintiff saw Joey Ackerman, LCSW and "exhibited anxious mood with expansive affect." (Tr. 541-42). Plaintiff reported that the primary issues "continue to be navigating and accessing appropriate medical care for his various issues." (Tr. 541). Mr. Ackerman noted that "[b]ased on documentation that was provided on his behalf, it is strange that they did not grant our request for part-time work only." (Tr. 541).

#### 2. Dr. Viviane Lind, Psychiatrist (2011-2015)

Viviane Lind, MD reported Plaintiff received treatment on a monthly basis from her from November 22, 2011 to September 3, 2015, with some gaps in treatment. (Tr. 485, 501).

On September 10, 2015, Dr. Lind completed a Social Security psychiatric report for Plaintiff. (Tr. 485-95). Plaintiff told Dr. Lind that his current condition was stable and "never having felt better." (Tr. 512). Dr. Lind also stated that the patient's treatment included "no medication at this time" and that they "will focus on therapy." (Tr. 486). Dr. Lind reported "no acute symptoms." (Tr. 486). Dr. Lind noted that Plaintiff could travel alone on a daily basis by bus and/or subway. (Tr. 487). Dr. Lind also stated that Plaintiff had no limitations in "restriction of the activities of daily living" or "difficulties in maintaining social functions," but that Plaintiff had marked limitation in "deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner," where marked impairments "seriously affect[] the ability to function." (Tr. 488). Dr. Lind noted that Plaintiff was "mostly limited by chronic pain." (Tr. 494).

On October 6, 2015, Dr. Lind completed a wellness plan report for Plaintiff. (Tr. 496). Dr. Lind noted that Plaintiff's chief complaint during his appointment was his depression and anxiety. (Tr. 496). On October 7, 2015, Dr. Lind stated that Plaintiff was "unable to work for at least 12 months" and commented that Plaintiff's main limitations were due to Plaintiff's medical conditions. (Tr. 499).

### 3.   Nurse Maria Quezada (2015)

On July 29, 2015, saw Maria Quezada, RN, for a behavioral health walk-in. (Tr. 524). Plaintiff presented "increase[d] episodes of moods swings and anxiety." (Tr. 524). Plaintiff presented with suicidal thoughts, and Nurse Quezada noted two prior suicide attempts. (Tr. 524).

### 4.   Dr. Shailinder Singh, Psychiatrist (2015)

On July 30, 2015, Shailinder Singh, MD saw Plaintiff for the possible suicidal ideation presented the prior day to Nurse Quezada, but clarified that Plaintiff presently reported no current suicidal ideation.[6] (Tr. 519).  Dr. Singh stated that Plaintiff's mood on July 30, 2015 was "depressed, affect is constricted but congruent to stated mood." (Tr. 521). On August 5, 2015, Plaintiff reported to Dr. Singh that he "ha[s]n't felt this good  in a long time . . . I finally feel like myself after so many years." (Tr. 515). Plaintiff was diagnosed with "Bipolar I disorder, most recent episode (or current) depressed, mild" at this visit. (Tr. 551).

### 5.   Dr. Richard Gersh, Psychiatrist (2015)

Richard Gersh, MD also saw Plaintiff on October 28, 2015, and stated that Plaintiff had an "anxious dysthymic" mood, "tangential" thought process, and "preoccupations or

---

[6] Dr. Singh noted that the suicidal ideations presented to Nurse Quezada, of jumping out the window, were thoughts in 2012 and not present thoughts.

obsessions" in thought content. (Tr. 504). Dr. Gersh stated that Plaintiff also complained of

severe headaches, and that Dr. Gersh and Plaintiff discussed switching from Risperdal to

Lamictal in order to treat Plaintiff's mood swings and in hopes that the switch would solve

Plaintiff's muscular pain. (Tr. 505).

### 6.   Marilyn Mota, Licensed Clinical Social Worker (2017)

On June 19, 2017, Plaintiff saw Marilyn Mota, LCSW, to fill out a mental health screening

form. (Tr. 1234). Plaintiff stated that he had little interest or pleasure in doing things "more

than half the days," felt down, depressed, or hopeless "several days," had trouble falling or

staying asleep, or sleeping too much "several days," felt tired or had little energy "more than

half the days," and had a poor appetite or overate "several days." (Tr. 1234). Plaintiff was

referred so that Plaintiff could request psychotherapy and medication. (Tr. 1234). Ms. Mota

concluded that Plaintiff had mild depression. (Tr. 1234).

### 7.   Katherine Appelbaum, Licensed Master Social Worker (2018)

On January 3, 2018, Katherine Appelbaum, LMSW provided a letter stating that Plaintiff

was being treated at Bailey House Behavioral Health Center and was seen for an initial

assessment on December 14, 2017. (Tr. 966). Ms. Appelbaum noted that Plaintiff was

scheduled for his first therapy session on December 20, 2017, and scheduled for his psychiatric

evaluation with Dr. Gadh on January 3, 2018. (Tr. 966). Ms. Appelbaum also noted that

Plaintiff's initial diagnosis was PTSD, Complex Type. (Tr. 966). Ms. Appelbaum also stated that

Plaintiff was scheduled for weekly therapy sessions and monthly psychiatric appointments. (Tr.

966). Ms. Appelbaum noted that Plaintiff's psychiatric medications at that time were Risperdal

and low dose Lithium. (Tr. 966).

On April 6, 2018, Ms. Appelbaum wrote a second letter, stating that Plaintiff's initial assessment at Bailey House Behavioral Health Center was on December 14, 2017. (Tr. 1162). Ms. Appelbaum stated that Plaintiff had been seen weekly for individual appointments since his initial assessment, and that he had been consistent with his appointments. (Tr. 1162). Ms. Appelbaum reported that Plaintiff had rarely missed a week of therapy, and that Plaintiff reported symptoms such as "mood dysregulation, poor sleep, anxiety, and a general sense of hopelessness." (Tr. 1162). Ms. Appelbaum also noted that Plaintiff's triggers were "his overall physical well being due to a diagnosis of Lyme disease as well as his unstable housing situation." (Tr. 1162). Ms. Appelbaum stated that since Plaintiff's Lyme disease diagnosis, Plaintiff's mood had gone from "experiencing depressive symptoms" to "increased bouts of anxiety." (Tr. 1162). Plaintiff's mental health diagnoses included Bipolar I (moderate), and generalized anxiety disorder. (1162).

### iii. Consultative Examiner Reports

#### 1. Dr. Artur Mushyakov, Intake-Phase I Doctor (2015)

On June 4, 2015, Artur Mushyakov, MD completed a medical evaluation of Plaintiff. (Tr. 474). Dr. Mushyakov noted that Plaintiff had no reported swelling in the joints, but mild limitations in his range of motion due to lower back pain. (Tr. 474-75). Dr. Mushyakov stated that Plaintiff complained of sharp, moderate pain in his lower back and joints. (Tr. 475). As a result of this examination, Dr. Mushyakov determined that Plaintiff should "avoid lifting heavy objects up to 10 lb. 1-10 times in 1 hr." and "avoid prolong standing up to 3 hrs." (Tr. 475). Dr. Mushyakov also determined that Plaintiff should "avoid prolong walking up to 3 hrs," "avoid pushing heavy objects up to 10 lb. 1-10 times in 1 hr.," "avoid prolong sitting up to 3 hrs,"

"avoid kneeling," and "avoid forceful or excessive bending up to 3 hrs." (Tr. 476).

Dr. Mushyakov did not note any limitations on manipulation or reaching. (Tr. 476).

Dr. Mushyakov did not indicate any limitations on Plaintiff's cognitive functioning for the purposes of a limitation on ability to work, but did note that Plaintiff should "avoid high stress" and "avoid dust." (Tr. 477). Dr. Mushyakov also noted that Plaintiff should be "seizure precautious" and "avoid[s] heights, avoid driving, avoid operating heavy machinery." (Tr. 478). Regarding work accommodations, Dr. Mushyakov stated that Plaintiff should "limit/eliminate lifting, pushing, pulling, carrying, stooping, bending, reaching," should "modify workload and/or pacing of work," work within a "low stress environment," and "eliminate dust, smoke, odor, fumes." (Tr. 478).

Dr. Mushyakov also found, *inter alia*, that Plaintiff had "anxiety state, unspecified," which was current, unstable, treated, and which impacts employment; "depressive disorder, not elsewhere classified," which was current, unstable, treated, and impacts employment; "other and unspecified arthropathies," which were current, stable, treated, and impact employment; "backache, unspecified," which was current, stable, treated, and impacts employment. (Tr. 480-82). Dr. Mushyakov also noted that Plaintiff should have flexible appointment hours due to his anxiety, depression, and panic symptoms. (Tr. 482).

In analyzing Plaintiff's Functional Capacity Outcome, Dr. Mushyakov stated that Plaintiff was "temporarily unable to work" for 90 days, due to anxiety, depression, and panic symptoms, "h/o arthritis, LBP, h/o diverticula, h/o allergy, h/o seizure, GERD, hearing problems, experiencing anxiety, depression, panic symptoms," and recommended a "psych follow up."

(Tr. 483). Dr. Mushyakov also stated that Plaintiff's "mental health conditions require better stabilization" and that Plaintiff would "benefit from [a] wellness plan." (Tr. 483).

### 2. Dr. Haruyo Fujiwaki, Psychologist (2017)

On July 3, 2017, Plaintiff met with Haruyo Fujiwaki, Ph.D of Industrial Medicine Associates, P.C. for a psychiatric evaluation. (Tr. 711). Dr. Fujiwaki noted that Plaintiff had been seeing a psychiatrist monthly at Metropolitan Hospital since 2012 or 2013. (Tr. 711). Dr. Fujiwaki stated that Plaintiff reported "difficulty falling asleep, frequent awakening four times per night and a loss of appetite," as well as "[d]ysphoric moods, crying spells, [and] loss of energy." (Tr. 711). Dr. Fujiwaki also noted that Plaintiff reported having panic attacks that sometimes occurred when leaving the house or when he was in public places. (Tr. 711).

Dr. Fujiwaki also noted that Plaintiff reported not being able to clean or do laundry due to pain, and that "friends and family" did those chores for him. (Tr. 712). Dr. Fujiwaki also stated that Plaintiff could take public transportation alone and could manage money. (Tr. 712). Plaintiff's family relationships were reported to be fair to poor. (Tr. 712). In assessing Plaintiff's vocational abilities and limitations, Dr. Fujiwaki stated that Plaintiff was able to "understand, remember or apply simple directions and instructions . . . understand, remember or apply complex directions and instructions and use reason and judgment to make work-related decisions." (Tr. 712). Dr. Fujiwaki also noted that Plaintiff was "mildly limited in interacting adequately with supervisors, coworkers and the public, and "mildly limited in "sustaining concentration and performing a task at a consistent pace." (Tr. 712). While Dr. Fujiwaki found that Plaintiff "can maintain personal hygiene and appropriate attire and be aware of normal

hazards and take appropriate precautions," Dr. Fujiwaki also noted that Plaintiff was "mildly

limited in regulating emotions, controlling behavior and maintaining well-being." (Tr. 712).

Dr. Fujiwaki noted that the results of this examination were consistent with psychiatric

problems, but that "in itself, this does not appear to be significant enough to interfere with

Plaintiff's ability to function on a daily basis." (Tr. 712). Dr. Fujiwaki diagnosed Plaintiff with

unspecified depressive disorder and unspecified anxiety disorder. (Tr. 712). Dr. Fujiwaki

recommended Plaintiff continue with current psychological and psychiatric treatment, and

determined Plaintiff's prognosis was "[f]air given symptoms." (Tr. 712). Dr. Fujiwaki noted that

Plaintiff had short-term memory deficits, and that the medications Plaintiff took sometimes

caused memory problems. (Tr. 713). Plaintiff appeared "dressed casually and well groomed,"

with "normal" posture and motor behavior, and "appropriately focused" eye contact, with

"adequate" speech and language skills. (Tr. 713). Dr. Fujiwaki noted that there was "no

evidence of hallucinations, delusions, or paranoia in the evaluation setting," and that Plaintiff

had a neutral mood because he was "feeling fine today, but has pain." (Tr. 713).

Dr. Fujiwaki summarized these findings in the Medical Source Statement of Ability to Do

Work-Related Activities (Mental) form, checking "mild" limitations on Plaintiff's ability to

understand and remember complex instructions; "moderate" limitations on Plaintiff's ability to

carry out complex instructions and make judgements on complex work-related decisions;

"mild" limitations in interacting appropriately with the public and with supervisors; and

"moderate" limitations in interacting appropriately with coworkers and responding

appropriately to usual work situations or charges in a routine work setting. (Tr. 715-16).

### 3. Dr. Eric Goldsmith, Psychiatrist (2018)

On May 1, 2018, Eric Goldsmith, MD completed a report regarding Plaintiff's psychiatric history and his professional assessment of Plaintiff's level of impairment. (Tr. 1300). Plaintiff's attorney, Krishna Kavi, requested the evaluation. (Tr. 1300). Dr. Goldsmith was recommended by the Legal Aid Society. (Tr. 87). Dr. Goldsmith interviewed Plaintiff and reviewed Plaintiff's medical records. (Tr. 1300).

Dr. Goldsmith stated that it was his opinion "to a reasonable degree of psychiatric certainty that [Plaintiff] meets diagnostic criteria for Major Depressive Disorder, Other Specified Trauma and Stressor-Related Disorder, and Somatic Symptom Disorder." (Tr. 1300). Dr. Goldsmith noted that Plaintiff did "not fully meet the criteria for Post Traumatic Stress Disorder, but [] does have identifiable stressors, which have caused marked distress in his life and significant impairment in social and occupational functioning." (Tr. 1300).

Dr. Goldsmith indicated that Plaintiff reported still being affected by the rapes that Plaintiff suffered at the hand of groups of other students when Plaintiff was a teenager. (Tr. 1302). Plaintiff told Dr. Goldsmith that these experiences still affected Plaintiff's ability to have sexual relationships as an adult, and that Plaintiff modified his behavior as a result of these experiences. (Tr. 1302). Dr. Goldsmith also stated that Plaintiff reported that the deaths of several family members over the years had a significant negative effect on his mental health. (Tr. 1303).

Dr. Goldsmith diagnosis of Somatic Symptom Disorder ("SSD") of Plaintiff is based in part on that Plaintiff "is preoccupied with his physical symptoms, namely his leg and back pain, as well as his fatigue and poor memory." (Tr. 1304). Further, "[r]ecords and his verbal history

indicate that he spends a significant amount of his time attending doctors appointments

(multiple appointments per week). When [Plaintiff] is at home, he devotes a significant amount

of time to researching his symptoms." (Tr. 1304). The SSD symptoms "have persisted for at

least two years and have essentially impaired his daily functioning." (Tr. 1304).

Dr. Goldsmith also noted that Plaintiff's depression was often linked to his physical

complaints. (Tr. 1304). Dr. Goldsmith remarked "[b]ased on the records from Ryan Center,

where he has been seen for years for his medical treatment, his most common and distressing

complaints (joint pain, back and leg pain, dizziness, headaches, fatigue) are not explained by

any active medical issue." (Tr. 1304). Dr. Goldsmith concluded that this "diagnosis greatly

interferes with [Plaintiff's] functioning." (Tr. 1305). First, Plaintiff is "experiencing pain, which

makes it difficult for him to perform his daily tasks; according to him and his medical reports,

he cannot even stand for more than fifteen minutes." (Tr. 1305). Second, Plaintiff "has become

so preoccupied with visiting doctors as well as watching videos and researching cures, that his

functioning has become so severely impaired." (Tr. 1305).

Dr. Goldsmith stated that Plaintiff, who "has suffered from a substantial decline in his

functioning" due to "experiencing repeated traumatic events," has "functional psychiatric

limitations" and "is not capable of working." (Tr. 1305).

### iv.   ALJ Hearing Testimony

#### 1.   Medical Expert Testimony

Dr. McKenna, certified in internal medicine and pulmonary disease, testified at Plaintiff's

ALJ hearing. (Tr. 47). The SSA paid for his services. (Tr. 48). Dr. McKenna opined on Plaintiff's

vision, diverticulosis, urinary complaints, low back pain, Lyme disease, plantar fasciitis, and

hearing loss. Regarding Plaintiff's low back pain, Dr. McKenna consulted Plaintiff's x-rays and MRIs, and concluded there was no evidence of peripheral neuropathy. (Tr. 53). Dr. McKenna also believed that there was no objective basis for Plaintiff's cane or walker. (Tr. 67).

Dr. McKenna discounted Dr. Baxter's opinion that Plaintiff suffered from chronic Lyme disease, saying it was not a credible disease. (Tr. 66 ("[T]he treating source believes that [Plaintiff] has this chronic Lyme disease, which I say is not kind of an approved diagnosis, so it's kind of a fad diagnosis.")).

Dr. Jucino-Berrios, a psychiatrist, also testified. (Tr. 112). The SSA paid for his services. (Tr. 113). Dr. Jucino-Berrios diagnosed Plaintiff with bipolar disorder and major depression. (Tr. 114). Dr. Jucino-Berrios conclude that Plaintiff "will only be able to do simple, one or two-step instructions." (Tr. 114-15). Dr. Jucino-Berrios further opined that Plaintiff's medical records lacked the appropriate mental status reports. (Tr. 119-21).

### 2.  Vocational Expert Testimony

A vocational expert, Pat Green, testified at the hearing. (Tr. 71-77). The ALJ asked whether an individual with Plaintiff's vocational profile who was limited to light work with occasional stair climbing, occasional bending, no working at heights, or near moving mechanical parts, no driving, no working near bodies of water, occasional exposure to extreme heat and cold and respiratory irritants, no working near fish (especially mussels or escargot[7]), who can do simple tasks and maintain attention for up to two hours at a time, should not work with the public but can have occasional contact with coworkers and can respond to supervision, could perform in the national economy. (Tr. 73-74). The VE responded that such an

---

[7] Plaintiff has a shellfish allergy.

individual could perform the jobs of assembler of small products, Directory of Occupational

Titles ("DOT") code 739.687-030, a hand packager, DOT code 559.687-074, and a final

assembler, DOT code 789.687-046. (Tr. 74-75).

**III.     Analysis**

    **A.  Applicable Legal Principles**

       **i.  Standard of Review**

A motion for judgment on the pleadings should be granted if the pleadings make it clear

that the moving party is entitled to judgment as a matter of law. However, the Court's review of

the Commissioner's decision is limited to an inquiry into whether there is substantial evidence

to support the findings of the Commissioner and whether the correct legal standards were

applied. Substantial evidence is more than a mere scintilla but requires the existence of

"relevant evidence as a reasonable mind might accept as adequate to support a conclusion,"

even if there exists contrary evidence. *See Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004);

*see also Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). This is a "very deferential standard

of review." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). The Court may

not determine *de novo* whether Plaintiff is disabled but must accept the ALJ's findings unless "a

reasonable factfinder would *have to conclude otherwise*." *Id*. (citations omitted).

      **ii.  Determination of Disability**

To be awarded disability benefits, the Social Security Act requires that one have the

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§ 423(d)(1)(A); *see also* 20 C.F.R. § 416.905(a). The ALJ makes this determination through a five-step evaluation process, for which the burden rests on the Plaintiff for the first four steps and only after all four steps are satisfied does the burden then shift to the Commissioner for the final step. 20 C.F.R. § 416.920; *see also Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019).

First, the ALJ must determine that Plaintiff is not currently engaged in substantial gainful activity. Second, the ALJ must find that Plaintiff's impairment is so severe that it limits her ability to perform basic work activities. Third, the ALJ must evaluate whether Plaintiff's impairment falls under one of the impairment listings in 20 C.F.R. Pt. 404, Subpart P, Appendix 1 ("Listings") such that she may be presumed to be disabled. Absent that, the ALJ must then determine the claimant's RFC, or her ability to perform physical and mental work activities on a sustained basis. Fourth, the ALJ then evaluates if Plaintiff's RFC precludes her from meeting the physical and mental demands of her prior employment. If Plaintiff has satisfied all four of these steps, the burden then shifts to the Commissioner to prove that based on Plaintiff's RFC, age, education, and past work experience, Plaintiff is capable of performing some other work that exists in the national economy.

### iii.   Treating Source Rule

The "treating source rule," also known as the "treating physician rule," is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating source's opinion.[8] A treating source's opinion will be given controlling

---

[8] Although not relevant here, the Court notes that the regulations governing the "treating physician rule" recently changed as to claims filed on or after March 27, 2017. *See* 20 C.F.R. §§ 404.1527, 404.1520c; Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 F.R. 5844-01, 2017 WL 168819, at *5844, *5867-68 (Jan. 18, 2017); a*ccord Cortese v. Comm'r of Soc. Sec.*, 16-CV-4217 (RJS), 2017 WL 4311133, at *3 n.2 (S.D.N.Y. Sept. 27, 2017).

weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record." 20 C.F.R. § 404.1527(c)(2); *see also Estrella*, 925 F.3d at 95-98; *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).

At step one, the ALJ must decide whether the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *Estrella*, 925 F.3d at 95-98. If the treating source's opinion meets these criteria, then it is "entitled to controlling weight." *Id.* Otherwise, the ALJ must proceed to step two and "determine how much weight, if any, to give" the opinion. *Id.* At step two, the ALJ must "*explicitly consider*" the following factors derived from *Burgess v. Astrue*, 537 F.3d 117 (2d Cir. 2008) (emphasis added): "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*, 925 F.3d at 95-96. At both steps one and two, "the ALJ must give good reasons in its notice of determination or decision for the weight it gives the treating source's medical opinion." *Id.* at 96.

"An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error." *Estrella*, 925 F.3d at 96 (citing *Selian v. Astrue*, 708 F.3d 409, 419-20 (2d Cir. 2013)). However, if "a searching review of the record" assures the Court "that the substance of the treating physician rule was not traversed," the Court should affirm. *Id.* (citing *Halloran*, 362 F.3d at 32). On the other hand, the Second Circuit has been clear that it will "continue remanding when [it] encounter[s] opinions from ALJ's [sic] that do not

comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Halloran*, 362 F.3d at 33.

### iv.  Duty to Develop the Record

"It is the rule in [the Second] [C]ircuit that 'the ALJ, unlike a judge in a trial, must . . . affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'" *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also* 20 C.F.R. §§ 404.1512(b), 416.912(b).

> "[T]he social security ALJ, unlike a judge in a trial, must on behalf of all claimants. . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Social Security disability determinations are "investigatory, or inquisitorial, rather than adversarial." "[I]t is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits."

*Moran v. Astrue*, 569 F.3d 108, 112-13 (2d Cir. 2009) (internal citations omitted; second alteration in original). This duty exists even when the claimant is represented by counsel. *Id*. This duty is "particularly important" when the plaintiff alleges a mental illness. *Hidalgo v. Colvin*, No. 12-CV-9009 (LTS) (SN), 2014 WL 2884018, at *4 (S.D.N.Y. June 25, 2014) ("This duty to develop the record is particularly important where an applicant alleges he is suffering from a mental illness[], due to the difficulty in determining 'whether these individuals will be able to adapt to the demands or 'stress' of the workplace.'" (quoting *Lacava v. Astrue*, No. 11-CV-7727 (WHP) (SN), 2012 WL 6621731 at *12 (S.D.N.Y. Nov. 27, 2012), *report and recommendation adopted*, 2012 WL 6621722 (Dec. 19, 2012)). While the ALJ may not need to supplement the record when the record already contains sufficient evidence, the ALJ must seek out additional

evidence where there are "obvious gaps' in the administrative record." *Id*. (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999)).

### v.   The ALJ's Decision

The ALJ applied the five-step analysis described above and determined that Plaintiff was not disabled. (Tr. 8-18).

After finding that Plaintiff had not engaged in substantial gainful activity since the AOD, ALJ Romeo found that Plaintiff suffered from the following severe impairments: "multilevel mild bilateral facet osteoarthritis in the lumbar spine, and a small disc bulge at L4-L5; plantar fasciitis; bipolar disorder; and major depressive disorder." (Tr. 11). The ALJ also found that Plaintiff had the following non-severe impairments: "dysuria, benign prostatic hypertrophy, and urethra impairment; presbyopia and blepharitis; diverticulosis; and [L]yme disease." (Tr. 11).

At step three, ALJ Romeo found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 11). Examining Plaintiff's physical impairments – multilevel mild bilateral facet osteoarthritis in the lumbar spine, a small disc bulge at L4-L5, and plantar fasciitis, ALJ Romeo found that because there was no evidence of "nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis" Plaintiff's physical limitations does not meet or medical equal Listing 1.04 and Plaintiff's back problems did not affect his ability to move "effectively." (Tr. 12). Examining Plaintiff's mental impairments – bipolar and major depressive disorders, ALJ Romeo found moderate limitations in: (1) understanding, remembering, or

applying information, (2) interacting with others; (3) concentrating, persisting, or maintaining

pace; and (4) adapting or managing oneself. (Tr. 12-13).

ALJ Romeo further noted that Plaintiff did not satisfy the "paragraph C" criteria of Listing

12.04, because "[t]he claimant does not have a medically documented history of the existence

of the disorder over a period of at least 2 years, and evidence of both: (1) medical treatment,

mental health therapy, psychosocial support, or a highly structured setting that is ongoing and

diminishes the symptoms and signs of Plaintiff's mental disorder; and (2) a marginal

adjustment where Plaintiff has minimal capacity to adapt to changes in his environment or to

demands that are not already part of his daily life." (Tr. 13).

The ALJ then determined that Plaintiff retained an RFC that allowed him to perform

"less than the full range of light work" and "can occasionally climb stairs and bend . . . cannot

work at heights or near moving mechanical parts, drive, or work near bodies of water due to a

history of seizures related to childhood epilepsy . . . . can have only occasional exposure to

extremes of heat and cold and respiratory irritants. . . . cannot work near fish, especially

mussels or escargot because of a history of allergies . . . . can perform simple tasks and

maintain attention for up to 2 hours at a time. . . . should not work with the public, but he can

have occasional contact with coworkers . . . . [and] can respond to supervision." (Tr. 13).

In making those determinations, the ALJ gave great weight to Dr. Lind's opinions and

treatment records, noting that these records showed "mild symptoms," but gave little weight

to Dr. Lind's October 7, 2015 analysis that Plaintiff would be unable to work for at least 12

months. (Tr. 15). The ALJ stated that she gave little weight to Dr. Lind's opinion on Plaintiff's

capacity to work because "it [was] a vocational opinion and not a medical opinion." (Tr. 15).

The ALJ gave some weight to Dr. Meisel's January 25, 2016 examination of Plaintiff, but stated that Dr. Meisel's opinions were vague. (Tr. 15). The ALJ stated that the vagueness of Dr. Meisel's opinion was "one of the reasons" that the ALJ had a medical expert at the hearing in order to provide an opinion on Plaintiff's RFC. (Tr. 15-16).

The ALJ gave some weight to Dr. Fassler's opinion that Plaintiff had no limitations based on psychiatric problems, but noted that additional evidence "received at the hearing level" indicated that Plaintiff does have a mental impairment. (Tr. 16).

The ALJ gave some weight to Dr. Fujiwaki's opinion that Plaintiff had a few moderate problems but "mostly none and mild problems." (Tr. 16). The ALJ noted that some weight was accorded to Dr. Fujiwaki's opinion because it was based on Dr. Fujiwaki's examination of Plaintiff and was "not inconsistent with the treating notes." (Tr. 16).

The ALJ gave little weight to Dr. Baxter's December 6, 2017 assessment of Plaintiff's ability to work because it was "not supported by the objective evidence in the record" and cited to Dr. McKenna's testimony. (Tr. 16). Although the ALJ noted that Dr. Baxter was a treating source, the ALJ stated that she gave great weight to the testimony of Dr. McKenna because "he read all of the evidence in the record" and testified that he would be impartial. (Tr. 16).

The ALJ gave no weight to Dr. Goldsmith's May 1, 2018 examination of Plaintiff because the ALJ opined that Dr. Goldsmith was paid for his examination and thus "there is no indication that [Dr. Goldsmith] was impartial." (Tr. 16). The ALJ noted that Dr. Goldsmith indicated that Plaintiff could not work, and that Plaintiff's major depressive disorder met the criteria of Listing 12.04. (Tr. 16)

The ALJ gave great weight to Dr. Jucino-Berrios's opinion that Plaintiff's mental impairments do not meet or medically equal a listing because "Dr. Jucino-Berrios read all of the medical records." (Tr. 16). Dr. Jucino-Berrios also testified that he would be impartial.

At step four, the ALJ concluded that Plaintiff was unable to perform his past work. (Tr. 16). At step five, relying on the testimony of the vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Plaintiff could perform, given his RFC, age, education, and work experience. (Tr. 17). The ALJ noted that the vocational expert testified that given Plaintiff's age, education, work experience, and RFC, Plaintiff could perform work as an assembler of small products, hand packer, and final assembler. (Tr. 17). Concluding that the vocational expert's testimony was consistent with the information contained in the Dictionary of Occupational Titles, the ALJ determined that Plaintiff could perform those occupations and, accordingly, was not disabled. (Tr. 18).

### B. Analysis of the ALJ's Decision

Upon review of the record and ALJ Romeo's decision, I find that her conclusions are not support by substantial evidence. Namely, ALJ Romeo traversed the treating source rule, arbitrarily discounted Dr. Goldsmith's opinion, and failed to properly consider Plaintiff's RFC.

### 1. The ALJ Traversed the Treating Source Rule

ALJ Romeo gave little weight to the opinion of Dr. Baxter, a primary care physician, who treated Plaintiff from 2012 through 2018. (Tr. 968). During Dr. Baxter's treatment of Plaintiff, Dr. Baxter repeatedly concluded that Plaintiff's mental illnesses were exacerbating his physical illnesses. *See, e.g.*, Tr. 876, 1043, 1061, and 1155. Dr. Baxter concluded in 2017 that Plaintiff could not work because working would cause his condition to further deteriorate. (Tr. 963).

Dr. Baxter also concluded in 2018 that Plaintiff's condition, especially with regarding to his hands, continued to deteriorate and that Plaintiff could not work on a regular and continuous basis, because doing so would exacerbate Plaintiff's joint pain, which would then worsen Plaintiff's depression. (Tr. 1159). Dr. Baxter opined that Plaintiff's Lyme disease "is linked to the deterioration of his musculoskeletal system, cardiovascular symptom[s], cognitive problems, and inflammatory arthritis." (Tr. 1155). ALJ Romeo gave little weight to Dr. Baxter's treating opinion in favor of Dr. McKenna's consultative opinion. (Tr. 16). Dr. McKenna did not examine Plaintiff, but "read all the evidence in the record." (Tr. 16).

In her decision, ALJ Romeo failed to justify giving Dr. Baxter's opinions "significant weight," attributing limited weight to them, but gave the consultative examiners' opinions greater weight. "Opinion evidence from non-examining sources and non-treating physician examiners typically should not weigh more heavily than that of a treating source." *McClinton v. Colvin*, No. 13-CV-8904 (CM) (MHD), 2015 WL 5157029, at *27 (S.D.N.Y. Sept. 2, 2015), *adopted by* 2015 WL 6117633 (S.D.N.Y. Oct. 16, 2015); *see also Selian*, 708 F.3d at 419 (remanding after ALJ credited a single consultative exam over treating physician's opinion). However, ALJ Romeo did just that. Dr. McKenna, the consultative examiner, based his opinion solely on a review of Plaintiff's medical record and without examining Plaintiff even once. Despite that limitation, ALJ Romeo's only stated rationale for her reliance was that Dr. McKenna reviewed the evidence. (Tr. 16; 66-67).

ALJ Romeo did not explicitly consider the *Burgess* factors as required. *See Estrella*, 925 F.3d at 95-96. More specifically, ALJ Romeo did not consider that Dr. Baxter was Plaintiff's primary care physician who regularly saw Plaintiff over the course of years. ALJ Romeo also did

not consider or weigh the medical evidence supporting Dr. Baxter's conclusion regarding the

impact of Plaintiff's Lyme disease, but instead accepted wholesale Dr. McKenna's conclusion

that it was a "fad diagnosis." (Tr. 11 ("[A]lthough the claimant's treating source diagnosed Lyme

disease, the medical expert said that was not correct per the CDC definition and/or the

American Infectious Disease Society.")). ALJ Romeo traversed the treating source rule by failing

to provide good reason for departing from Dr. Baxter's opinion. *See Estrella*, 925 F.3d at 96.

### 2.   The ALJ Arbitrarily Gave Dr. Goldsmith's Opinion No Weight

Courts have rejected the notion that a consultative examiner's opinion is less credible

when it is obtained by the claimant. *See Crowder v. Collins*, 561 F. App'x 740, 743 (10th Cir.

2014) ("This court long ago rejected" "[the position] that a consulting examiner's opinion is

necessarily less trustworthy when it is sought or obtained by the claimant."); *Summers v. Soc.*

*Sec. Admin.*, No. 14-CV-936 (KG) (LF), 2016 WL 10538644, at *6 (D.N.M. Mar. 12, 2016) ("[T]he

law does not permit the ALJ to presume bias merely because the plaintiff hired the consultative

examiner.").

Here, the ALJ assigned no weight to the Plaintiff's consultative examiner's opinion,

Dr. Goldsmith's, because he was "paid," but assigned great weight to the Commissioner's

consultative examiners' opinions, Drs. Jucino-Berrios's and McKenna's. (Tr. 16). There was no

evidence that Dr. Goldsmith, who personally examined Plaintiff, was unreliable outside of the

fact that he was paid for the consultation, which has been rejected by courts as a valid basis to

discount credibility. *See Crowder*, 561 F. App'x at 743; *Summers*, 2016 WL 10538644 at *6. ALJ

Romeo's reasoning is especially weak because Drs. Jucino-Berrios and McKenna were also paid

for their services and never even personally examined Plaintiff.[9] (Tr. 16). The only explanation

given by ALJ Romeo was that Drs. Jucino-Berrios and McKenna testified that they would be

impartial. However, Dr. Goldsmith was never questioned, much less on his ability to be

impartial. Dr. Goldsmith's opinion is especially useful given Plaintiff's intermittent psychiatric

care and lack of current treating psychiatrist. On remand, if the ALJ gives little weight to Dr.

Goldsmith's opinion, there must be more robust reasoning, and the ALJ must explicitly consider

Listing 12.07, somatic symptom and related disorders.

### 3.   The ALJ Did Not Properly Determine Plaintiff's RFC

Additionally, the ALJ noted that the vocational expert testified that there would be "no

work in the national economy" if Plaintiff were unable to use his hands. (Tr. 18). However, the

ALJ stated that loss of use of Plaintiff's hands was not supported by medical evidence. (Tr. 18).

In doing so, the ALJ ignored not only Plaintiff's testimony that he had to give up knitting as a

result of his loss of motor control (Tr. 18), but also medical records and treatment notes

documenting Plaintiff's complaints of pain in his hands. *See, e.g.*, Tr. 622-23, 824, 847, 945,

1051, 1155. Dr. Baxter also noted in his April 2018 letter that Plaintiff's use of his hands has

gradually deteriorated. (Tr. 1155). Therefore, the deterioration of Plaintiff's use of his hands is

not unsupported by the record.

Further, ALJ Romeo cited Plaintiff's medical imaging that did not show severe damage to

his spine (Tr. 11-12) but failed to consider that "[m]edical science confirms that pain can be

severe and disabling even in the absence of 'objective' medical findings, that is test results that

demonstrate a physical condition that normally causes pain for the severity claimed by the

---

[9] Dr. McKenna also failed to address Plaintiff's persistent headaches.

applicant." *Carradine v. Barnhart*, 360 F.3d 752, 753 (7th Cir. 2004). Because ALJ Romeo

discounted both Dr. Baxter's and Dr. Goldsmith's opinions, which both suggested a

psychosomatic link, there was no consideration of the connection between Plaintiff's mental

status and physical status. *See, e.g.*, Listing 12.07 (somatic symptoms and related disorders). An

ALJ "cannot simply selectively choose evidence in the record that supports his conclusions."

*Meadors v. Astrue*, 370 F. App'x 179, 185 n.2 (2d Cir. 2010). Accordingly, ALJ Romeo failed to

properly determine Plaintiff's RFC.

Even if, as the ALJ contends, Dr. Baxter's medical opinions (or those of other doctors

who concur) are not supported by the record, the ALJ was required to seek clarifications from

Dr. Baxter or other treating physicians, particularly the specialists that examined Plaintiff and

reviewed his medical records, or to seek the opinion of a consulting medical expert; she may

not substitute her own medical opinion. *See Gavazzi v. Berryhill*, 687 F. App'x 98, 100 (2d Cir.

2017) (summary order) ("Although the record as it stands does not support a decision to assign

minimal or no weight to the opinions of [plaintiff's treating physician] on these topics, the ALJ

may further develop the record by, for example, arranging for the input of another examining

physician"); *Pagan v. Comm'r of Social Sec.*, 16-CV-3774 (ER) (HBP), 2017 WL 9565536, at *15

(S.D.N.Y. July 13, 2017) (remanding for review of factors relevant to treating physician rule and

possible development of medical evidence from creating physicians or an independent medical

expert), *report and recommendation adopted*, 2017 WL 4174815 (S.D.N.Y. Sept. 20, 2017).

On remand, the ALJ should properly assess the treating physician rule and Plaintiff's RFC

in light of all of the evidence and relevant factors, and should properly consider "the combined

effect of [the] claimant's impairments," *Dixon v. Shalala*, 54 F.3d 1019, 1031 (2d Cir. 1995) and

her conclusions must be based on *all* of the relevant evidence in the case record.[10] *See also* 20 C.F.R. § 404.1529(c)(3)(iv)).

IV.   **Conclusion**

For the foregoing reasons, the Commissioner's Motion for Judgment on the Pleadings is **DENIED**, and the case is remanded for further proceedings pursuant to 42 U.S.C. § 405(g).

The Commissioner is directed to serve a copy of this Order on the *pro se* Plaintiff and file an affidavit of service within seven days of this Order.

The Clerk of Court is respectfully directed to mail a copy of this Order to the *pro se* Plaintiff and terminate all open motions.

**SO ORDERED.**

_s/ Ona T. Wang_

Dated: March 19, 2021                                    **Ona T. Wang**
          New York, New York                          United States Magistrate Judge

---

[10] There may also be medical records missing from the file. For example, there are no records nor any explanation why those records do not exist of Plaintiff's visits to the orthopedic specialists to which Dr. Baxter referred him and later noted as Plaintiff having seen them. Without these records, there can be no full evaluation of whether or not Dr. Baxter's assessment of Plaintiff's ability is supported by other evidence in the record. *See, e.g.*, Tr. 1060. Further, Dr. Lind reported treating Plaintiff on a monthly basis with "some gaps in treatment" from November 22, 2011, but the first record of Dr. Lind seeing Plaintiff was September 3, 2015. (Tr. 485). Similarly, Dr. Baxter reported being Plaintiff's primary care physician since January 3, 2012. (Tr. 968). Although Dr. Baxter electronically co-signed Dr. Sequeira's notes on September 18, 2012 (Tr. 812), the first records of Dr. Baxter seeing Plaintiff were from August 10, 2016. (Tr. 916). On remand, the ALJ shall ensure that the duty to develop the record is fulfilled. *See Hidalgo*, 2014 WL 2884018 at *4 (duty to develop record particularly important where plaintiff has mental illness).